COMMONWEALTH of Pennsylvania,
Appellee,

v.

Roscoe BROWN, Jr., Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 11, 2006.

Filed Nov. 9, 2006.

Lee Mandell, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before JOYCE, STEVENS, and POPOVICH, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction by a jury on the charges of first-degree murder, robbery, and carrying a firearm without a license.[1] Appellant contends a new trial is warranted since (1) the prosecutor improperly made inflammatory statements during his closing argument to the jury, (2) the trial court erred when it failed to give Appellant's suggested jury instruction in response to a question the jury asked during deliberations, and (3) the trial court erred in permitting Randy Brown to testify that Appellant was unemployed at the time of the murder. We affirm.

¶ 2 The relevant facts and procedural history are as follows: Appellant was employed by the victim, who owned a Betty Brite Cleaner in Philadelphia, for approximately two weeks. On the morning of November 8, 2004, Appellant confronted the victim, shot him twice, and kicked him repeatedly in the head. After the murder, Appellant stole the victim's van, fled the scene, and went to Atlantic City, New Jersey. The next day, Appellant told his brother, who was employed by the victim for approximately fifteen years, that he had killed the victim.

¶ 3 Appellant was subsequently arrested and, after informing Appellant of his Miranda[2] rights, Detective Gerald Lynch questioned Appellant. During the questioning, Appellant indicated he would tell the detective what had occurred but that he did not want to be sent to death row. Detective Lynch contacted the chief of the homicide unit of the district attorney's office, who agreed not to seek the death penalty in exchange for Appellant's statement. Appellant then confessed he shot the victim and stole his van.

¶ 4 Appellant filed a pre-trial motion seeking to suppress, inter alia, his confession, and the trial court denied the motion. Appellant, who was represented by counsel, then proceeded to a jury trial and was convicted of the offenses indicated supra. On November 14, 2005, the trial court sentenced Appellant to a mandatory term of life in prison for his first-degree murder conviction, with consecutive terms for his remaining convictions. This timely appeal followed.[3]

■ ¶ 5 Appellant first contends a new trial is warranted since the prosecutor improperly inserted his personal opinion by making inflammatory statements during his closing argument. Specifically, Appellant points this Court to the following portions of the prosecutor's closing argument:

---

1. 18 Pa.C.S.A. §§ 2502, 3701, and 6106, respectively.

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. The trial court did not order a Pa.R.A.P. 1925(b) statement, and Appellant filed no such statement. However, the trial court filed a Pa.R.A.P.1925(a) opinion.

PROSECUTOR: When that bullet that tore through [the victim's] flesh exited, it was described as what is called a shored exit wound.

Now, why is that important, ladies and gentlemen? It is important for this reason. Shored means that the body, if this is the body of [the victim] and this is the floor, shored means that type of exit wound is consistent with the body being up against the ground such that the bullet, when it passes through the body, can't really fully exit because the body is pressed up against the ground.

The bullet can't tear through the flesh and then exit the body and go somewhere else. Sometimes bullets stay in a person and sometimes they exit and I think your common sense should tell you in .45 caliber, it is a large caliber gun, bullets tend to exit the body.

In this particular case, you have a shored exit wound of that fatal shot which means, ladies and gentlemen, [the victim] is down. He was down when he got shot.

It was personal, ladies and gentlemen, **this was a stone-cold execution.**

DEFENSE ATTORNEY: Objection, Your Honor.

THE COURT: Well, this is argument.

N.T. 9/1/05 at 54–56 (emphasis added).

PROSECUTOR: It is indicative of first degree murder, ladies and gentlemen, because what that tells you is that when [the victim] was shot the first time, he went down and he went down to the ground and he was shot a second time and that exit wound was shored and **he was executed in his own store.**

DEFENSE ATTORNEY: I would object to that again, Your Honor.

THE COURT: I will allow it. It is argument.

N.T. 9/1/05 at 57–58 (emphasis added).[4]

■ ¶ 6 At the conclusion of the prosecutor's closing argument, defense counsel requested a mistrial on the basis the prosecutor had used the word "execution" approximately nine times, resulting in a cumulative effect of prejudice. N.T. 9/1/05 at 94–95. The trial court denied the request. N.T. 9/1/05 at 95–96.

In reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation, but rather, must be considered in the context in which they were made. Generally, comments by the district attorney do not constitute reversible error unless the avoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Sampson,* 900 A.2d 887, 890 (Pa.Super.2006) (quoting *Commonwealth v. Correa,* 444 Pa.Super. 621, 664 A.2d 607, 609 (1995)).

■ ¶ 7 In the case *sub judice,* the evidence at trial indicated that Appellant worked for the victim for approximately two weeks and was fired because he was working too slowly. The victim subsequently re-hired Appellant, presumably giving him another chance because Appellant's brother had worked for the victim for approximately fifteen years. After only two days, the victim fired Appellant, who later confronted the victim in his store. Appellant's first shot resulted in a bullet lodging in the victim's vertebrae column bringing the victim to the ground. A

---

4. Appellant also points this Court to the prosecutor's use of the phrase "gruesome execution." N.T. 9/1/05 at 83. However, Appellant admits that he did not immediately object to this portion of the prosecutor's closing argument.

customer entered the store, and Appellant waited on the customer as if he still worked at the store. The customer left, and Appellant repeatedly kicked the victim, who was still lying on the ground, in the head and then shot him in the chest. Given these facts, characterization of the killing as an "execution" was neither inaccurate nor particularly prejudicial. *See Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003) (holding that prosecutor's repeated use of word "execution" did not unduly inflame passion of jury during death penalty phase); *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990) (holding that prosecutor's remark that murder was a well thought out, carefully planned execution was perfectly innocuous). A prosecutor has great discretion during closing argument. Indeed, closing "argument" is just that: argument.

¶ 8 Appellant next contends the trial court erred when it failed to give Appellant's suggested jury instruction in response to a question the jury asked during deliberations. We find the issue to be meritless.

¶ 9 During its deliberations, the jury sent the trial court a note which read: "Clarification of the law: after asking for a lawyer can the police continue to question?" N.T. 9/1/05 at 143–144. In discussing how the trial court should respond to the question, the following exchange occurred:

> THE COURT: Clarification of law after asking for a lawyer, can the police continue to question? That law, they don't have. I never gave them any law on that point.
>
> DEFENSE ATTORNEY: I have a suggestion in that regard if the Court would entertain.
>
> THE COURT: Yes.
>
> DEFENSE ATTORNEY: My suggestion is to advise them that if you believe the Defendant asked for a lawyer and was not given one, then you should consider this along with all the other evidence relating to the circumstances pertaining to the interrogation of the Defendant in deciding whether or not the statement was voluntary.
>
> DISTRICT ATTORNEY: I would object. I object to that.
>
> The Commonwealth's proposed answer to that question is more general in nature and is not designed to favor one side or the other.
>
> It is just basically to remind the jury that you are the judges of the facts, you, the jury: that I am the judge of the law; and the question that you have asked is a legal question and it is not for your consideration, the law.
>
> The facts or circumstances regarding the statement are for your consideration, but not the law because the question specifically says what is the law; unless, of course, it is the jury asking to be re-instructed on the standard charge regarding voluntariness of the statement, which that may be an inartfully drafted question.
>
> THE COURT: Right. I can tell them that if they want, that I can give them that if they want, that I can give that to them; but this is a question of law not for their consideration. They are to determine the facts.
>
> DISTRICT ATTORNEY: Right.
>
> DEFENSE ATTORNEY: So, you are rejecting my suggestion at this point?
>
> THE COURT: Yes.
>
> Then I will tell them if they want the law again on voluntariness, I will reread that.

N.T. 9/6/05 at 18–20.

¶ 10 The trial court then instructed the jury as follows:

THE COURT: You have asked for clarification of the law after asking for a lawyer, can police continue to question?

This is a question of law, Jurors, not for your consideration. You are to determine the facts.

If you wish me to read to you the law to consider for confessions, then I will reread to you the law that I did already read to you with regard to that.

Is that what you would like?

\* \* \*

(Whereupon, the jury panel collectively answers in the affirmative, at this time.)

\* \* \*

THE COURT: Jurors, there was a statement introduced that was prepared by Detective Lynch.

Before you can accept that statement, several things must happen.

You must not consider that statement as evidence against the Defendant unless you find that the Defendant, in fact, made the statement.

Only so much of a statement, as was actually made by a Defendant, may be considered as evidence against him to be judged for truthfulness and weighed along with all the other evidence in determining whether he has been proven guilty.

You must not consider the statement as evidence against the Defendant unless you find that he made the statement voluntarily.

This means that you must disregard the statement unless you are satisfied by a preponderance of the evidence.

Preponderance means a little more on one side than the other, 51 percent to 49 percent; that is, by a greater weight of the evidence that the Defendant made the statement voluntarily.

To be voluntary, a Defendant's statement is always regarded as voluntary if it is made spontaneously, that is, not in response to police questioning.

This is true even though the Defendant speaks out of some internal compulsion to speak.

To be voluntary, a Defendant's statement must be the product of a rational mind and a free will.

The Defendant must have had a mind capable of reasoning about whether to make the statement or to say nothing and he must be allowed to use it.

Now, this does not mean that a statement is involuntary merely because the Defendant made a hasty or poor choice and might have been wiser to say nothing nor does it mean that a statement is involuntary merely because it is made in response to police questioning.

It does mean, however, that if a Defendant's mind and will are confused or burdened by promises of advantage, threats, physical or psychological, or any other improper influence, any statement which he makes is involuntary.

In deciding whether the statement was voluntary, you should weigh all of the facts and circumstances surrounding the making of the statement which shed light on whether the statement was the product of an essentially free will at the time.

The facts and circumstances to be considered include the age, sex, intelligence, personality, education, experience and mental and physical state of the Defendant; how the Defendant was treated before, during and after the questioning; the time, place and conditions under which the Defendant was detained and questioned; the motives and attitudes of the police who questioned him and what they said; what

was said and done by the police, the Defendant and anyone else present during the questioning.

In determining voluntariness, you should also consider whether there was any violation of Miranda requirements that were established by the United States Supreme Court in a case many years ago.

Broadly speaking, Miranda requires that the police, before questioning a suspect in custody, give him certain warnings.

The essence of the warnings is that he has the right to remain silent, that anything he says can be used against him, and that he has the right to the advice and presence of his own or free attorney.

The police are not to question the suspect unless he understands the warnings and knowingly and intelligently, free and expressly, gives up his right to silence and an attorney.

If you find, after applying all of these principles, that the Defendant made the statement and that he made it voluntarily, you may then consider the statement as evidence against him.

You should consider the facts and circumstances surrounding the making of the statement along with the other evidence in the case in judging its truthfulness and deciding how much weight, if any, the statement deserves on the question of whether or not the Defendant is guilty of the crimes charged.

N.T. 9/6/05 at 27–33.

■ ¶ 11 Before addressing the merits of Appellant's challenge to the trial court's supplemental jury instruction, we must determine whether the claim has been properly preserved. A review of the record reveals that Appellant did not take an exception or lodge an objection at the time of the trial court's ruling on his proposed

supplemental instruction or following the giving of the supplemental charge. Rather recently, the Pennsylvania Supreme Court clarified the procedures to be used to preserve an issue respecting a proposed jury instruction. Specifically, the Supreme Court held "[t]he pertinent rules ... require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction." *Commonwealth v. Pressley*, 584 Pa. 624, 887 A.2d 220, 224 (2005) (footnote omitted). However, the Supreme Court indicated that its clarification was to apply prospectively only, noting that an existing line of cases provided that where a proposed charge was rejected by the trial court any challenge thereto was preserved without an exception or specific objection. *See id.; Commonwealth v. Young*, 474 Pa. 96, 376 A.2d 990 (1977); *Commonwealth v. Williams*, 463 Pa. 370, 344 A.2d 877 (1975).

■ ¶ 12 Here, Appellant's trial occurred prior to the Supreme Court's pronouncement in *Pressley*, and therefore, its clarification is inapplicable to this case. Consequently, since there is authority supporting the position that Appellant preserved his claim by submitting a proposed supplemental jury instruction, which the trial court specifically denied, we decline to find waiver and proceed to address the merits of Appellant's claim. *See Young, supra*.

"[I]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this [C]ourt to determine whether the record supports the trial court's decision." In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which

controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Thomas,* 904 A.2d 964, 970 (Pa.Super.2006) (quotation and citations omitted).

¶ 13 "The issue of the constitutional admissibility of a defendant's statement to the police is to be submitted to the jury for its resolution.... [T]he jury's determination of involuntariness is to be based on the totality of the circumstances...." *Commonwealth v. Cox,* 546 Pa. 515, 686 A.2d 1279, 1286–1287 (1996) (citations omitted). After a careful review of the trial court's instruction regarding the voluntariness of Appellant's confession, we conclude the instruction comports with Pennsylvania's Suggested Jury Instructions and is similar to instructions previously accepted by the appellate courts of this jurisdiction. *See Cox, supra; Commonwealth v. Ort,* 398 Pa.Super. 475, 581 A.2d 230 (1990). In particular, pertaining to Appellant's right to counsel during police questioning, we conclude the trial court adequately explained Appellant's rights. *See Ort, supra.* Therefore, we find Appellant's challenge to the trial court's supplemental jury instruction to be meritless.

¶ 14 Appellant's final contention is that the trial court improperly permitted the Commonwealth to introduce into evidence testimony establishing that Appellant's motive for killing the victim was related to Appellant's unemployment. Specifically, Appellant points this Court to the following exchange, which occurred during the direct-examination of Appellant's brother:

DISTRICT ATTORNEY: Now, in that time period after [Appellant] was fired by [the victim], leading up to that Monday morning the day of the murder, did your brother say anything to you about money or needing money?

DEFENSE ATTORNEY: Objection, Your Honor.

THE COURT: What, if anything.

DEFENSE ATTORNEY: What, if anything did your brother say to you about money ?

THE COURT: You are saying the Sunday before the Monday of the murder?

DISTRICT ATTORNEY: I am saying from the time he was terminated, to that Monday morning.

THE COURT: Within that month or month-and-a-half?

DISTRICT ATTORNEY: Yes, in the days or weeks leading up to the murder, what, if anything, did your brother say about money.

DEFENSE ATTORNEY: I will still object.

THE COURT: I will allow it. You can answer.

[APPELLANT'S BROTHER]: He said his pockets was *[sic]* hurting. He had no money. He said he hopes he gets a job or he had to do something drastic.

N.T. 8/30/05 at 142.

¶ 15 Appellant contends his brother's testimony established that Appellant was

unemployed, which "cast him in a negative fashion before the hardworking citizens who constituted the jury." Appellant's brief at 13.

■ ¶ 16 "The admission of evidence is in the sound discretion of the trial judge, and will not be disturbed on appeal absent a manifest abuse marked by an error of law." *Commonwealth v. Brennan*, 696 A.2d 1201, 1203 (Pa.Super.1997) (citations omitted).

■ ¶ 17 As Appellant correctly argues, the Supreme Court has held that the Commonwealth cannot use evidence of a defendant's unemployment to establish a motive to commit a crime. *Commonwealth v. Barkelbaugh*, 526 Pa. 133, 584 A.2d 927 (1990) *(citing Commonwealth v. Haight*, 514 Pa. 438, 525 A.2d 1199 (1987)). That is, the Commonwealth cannot introduce evidence of unemployment in order to suggest to the jury some stigma to be attached to unemployed individuals. *See Brennan, supra.* However, this Court has held that there is no absolute bar to the admission of all evidence of financial difficulties. *Commonwealth v. Wax*, 391 Pa.Super. 314, 571 A.2d 386 (1990). That is, where evidence of the financial difficulty/debt is specific and evidence of the debt was not intended to stigmatize the appellant on the basis of his economic status, the general prejudice discussed in *Barkelbaugh* is not present. Under such circumstances, the admissibility of the disputed testimony should be assessed under the traditional considerations of relevancy. *Wax, supra.*

Relevant evidence is that which, either taken alone or in connection with other evidence, tends to prove or disprove some material issue in the case. Stated another way, to establish relevancy we ask whether the evidence sheds light upon or advances the inquiry in which the fact-finder is involved. If the evidence in question is logically relevant it is admissible unless the trial court, in its discretion, determines that its potential prejudicial impact outweighs its probative value.

\* \* \*

[E]vidence of specific debts may be introduced where the jury may clearly draw an inference that the financial difficulties of the defendant were material to his motive or state of mind in committing a crime. We recognize that while evidence of indebtedness or of other financial burdens may be clearly probative of a possible motive to commit a crime for monetary gain, we must also consider whether, on the other side of the equation, the potential for prejudice outweighs the obvious relevance of the proof. We are sensitive to the fact that a blanket application of this principle would "prove too much against too many" and may encourage the Commonwealth to argue that a "defendant [with] no apparent means of income … was more likely to commit a crime for dollar gain." We do not hold that financial indebtedness is always relevant. Instead, we require a common sense evaluation of the disputed evidence and an inquiry into whether the probative value of the evidence exceeds its prejudicial impact

*Id.* at 388–389 (citations omitted).

¶ 18 In the case *sub judice*, proof of Appellant's financial status prior to the victim's murder was both specific and substantial. Unlike in *Barkelbaugh* and *Haight*, the jury here was not asked to speculate on a chain of inferences far too weak to be probative and the testimony elicited from Appellant's brother was not done in order to suggest to the jury some stigma to be attached to unemployed individuals. Rather, the evidence tended to

establish that Appellant's financial difficulties were linked directly to the fact the victim fired Appellant, and Appellant blamed the victim for his financial difficulties.[5] Moreover, the evidence established that, while Appellant had no money the day before the victim's murder,[6] he had sufficient money to gamble and stay at a hotel in Atlantic City, New Jersey immediately following the robbery/homicide at issue.

¶ 19 We conclude Appellant's pressing financial difficulties prior to the victim's murder and robbery accompanied by his ability to travel and gamble immediately thereafter can hardly be said to lack a logical connection to the crimes in this case. "The evidence was relevant to establish [A]ppellant's motive or state of mind in committing the offense with which he was charged." *Wax*, 571 A.2d at 389 (citations omitted). Furthermore, the probative value of this evidence clearly outweighed its prejudicial effect. *Id.* "The evidence was not inherently prejudicial and did not raise problems of stigma and unfairness such as those implicated in *Haight*." *Wax*, 571 A.2d at 389. Therefore, the trial court properly overruled defense counsel's objection thereto, and a new trial is not warranted on this basis.

¶ 20 Affirmed.

---

**5.** Appellant's brother testified that Appellant "thought he was going to have something stable at the time." N.T. 8/30/05 at 132.

**6.** For example, on the day before the victim's murder, Appellant did not have enough money to chip in for beer while watching a football game at his brother's house. N.T. 8/30/05 at 137–138.