J-S60002-12

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID VASQUEZ JORDAN, | : | |
| | : | |
| Appellant | : | No. 655 MDA 2011 |

Appeal from the Judgment of Sentence Entered March 21, 2011,
In the Court of Common Pleas of Lancaster County,
Criminal Division, at No. CP-36-CR-0001618-2010.

BEFORE:  SHOGAN, MUNDY and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED SEPTEMBER 03, 2014**

Appellant, David Vasquez Jordan, appeals *pro se* from the judgment of sentence entered on March 21, 2011.  We affirm.

We summarize the facts of the crime.  On October 24, 2004, Appellant and his three confederates, Edward Major, Hayward Stewart, and Michael Stewart ("Co-defendants"), gathered at 19 Seymour Street in Lancaster, Pennsylvania, at the home of Edward's cousin, Kevin Major, and Kevin's girlfriend, Penny Dotson.  N.T., 3/8/11, at 660.  Penny testified that Kevin, with whom she had an "off-and-on" relationship, sold crack cocaine, and "Eddie," who also sold crack, lived with them at that time.  *Id*. at 660–661, 665, 671.  On that particular day, Penny overheard the men talking about committing a robbery.  *Id*. at 673.  In particular, Penny recognized "Eddie's"

voice and also heard Michael say, "[T]hey wanted to rob the white bitch, Heather." *Id*. at 674. Penny testified that she left the house for a few hours, ostensibly to go to work, and when she returned, only Eddie and Kevin were present. *Id*. at 676–678. Shortly thereafter, the other men returned together, and while they were in the kitchen, Penny heard Michael say that "she was shot." *Id*. at 678–680.

Kevin Major, testifying pursuant to a "cooperation guilty plea agreement," testified that when the men met on October 24, 2004, at the house he shared with Penny Dotson, everyone but Hayward smoked "weed" that Kevin provided. N.T., 3/9/11, at 844, 858. Kevin testified that Appellant stated he wanted "to rob somebody," and Appellant identified Heather "from Pearl Street" as that person. *Id*. at 860–861. Appellant and his co-defendants, all with a history of drug dealing together, agreed with this robbery plan because they believed Heather had drugs and money. *Id*. at 861–863, 870–874. Kevin testified that he provided the use of a car that was in his possession, that the only reason he did not go with the men was because he "was watching the kids," and that he expected a cut of the money obtained in the robbery "because I provided them with the car." *Id*. at 864–869.

Following a six-year investigation, Appellant was charged with one count of criminal homicide on February 25, 2010. Appointed counsel,

Lancaster County Assistant Public Defender James A. Gratton, filed an *omnibus* pretrial motion on December 1, 2010. On January 25, 2011, Appellant filed a motion to proceed *pro se*.[1] On January 28, 2011, the trial court began an on-the-record inquiry pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1988). The trial court delayed ruling on Appellant's competency and referred Appellant for a mental health evaluation at the conclusion of the hearing because Appellant refused to permit review, *in camera*, of the competency evaluation from his jury trial before Judge Knisely.

Appellant and Co-defendants proceeded to trial before the Honorable Joseph C. Madenspacher and a jury beginning on March 3, 2011. At the start of trial, President Judge Madenspacher, following a colloquy, permitted Appellant to proceed *pro se*, with Attorney Gratton as stand-by counsel. The jury convicted Appellant on March 18, 2011, of second-degree murder.[2] On

---

[1] Appellant had recently completed a trial on unrelated murder charges on November 16, 2010, at Lancaster County Court of Common Pleas Docket No. 261 of 2010, before the Honorable Howard F. Knisely and a jury. In that case, Appellant was represented at trial by Assistant Public Defender James Gratton and was found guilty of third-degree murder. The sentence imposed therein was made consecutive to the sentence in the instant case. Following a **Grazier** hearing in that case, Appellant proceeded *pro se* in that direct appeal.

[2] Co-defendant Edward Major was convicted of first degree murder. Because the jury was unable to reach a verdict regarding Michael and Hayward Stewart, the court declared a mistrial. They subsequently pled

March 21, 2011, the trial court sentenced Appellant to life imprisonment without the possibility of parole.

On March 30, 2011, Appellant filed a *pro se* purported motion pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, which the trial court treated as Appellant's direct appeal. On April 1, 2011, the trial court appointed Attorney Vincent J. Quinn to represent Appellant on appeal. In response to the trial court's order to do so, Attorney Quinn filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on June 9, 2011, and the trial court filed an opinion on July 1, 2011.

Thereafter, Appellant filed, in this Court, an application for permission to proceed *pro se* on August 29, 2011, and an application for remand on September 6, 2011. Pursuant to those motions, we remanded the matter on October 4, 2011, for an on-the-record inquiry pursuant to ***Grazier*** and a determination of whether Appellant's waiver of counsel was knowing, intelligent, and voluntary.

Following the ***Grazier*** hearing on October 31, 2011, the trial court concluded that Appellant's waiver of counsel was knowing, intelligent, and voluntary; thus, Appellant has proceeded *pro se* since that time. Unfortunately, what followed plunged this matter into a procedural morass, which finally, has been rectified. On October 23, 2012, this Panel sent for

---

guilty to conspiracy to commit robbery. Trial Court Opinion, 4/1/14, at unnumbered 1.

filing an order that was never docketed and filed due to administrative error. That order provided that Appellant, now *pro se*, was permitted to amend his Pa.R.A.P. 1925(b) statement, and further directed the trial court to file a new opinion, followed by the issuance of a new briefing schedule. On January 22, 2014, upon discovery of the administrative error, this Court filed an order directing the amendment of the Rule 1925(b) statement, and the filing of a new trial court opinion and briefs by the parties. Those documents now have been filed; thus, we proceed to disposition of this appeal.

Appellant raises the following issues for our review:

A. Whether the Commonwealth failed to establish beyond a reasonable doubt the element of second degree murder that Edward Major killed Heather Nunn while [Appellant] was engaged as a principle or an accomplice in committing or attempting to commit robbery, or while fleeing after either committing or attempting to commit a robbery or as defined in the text at 18 Pa.C.S. §§ 2502(b), 2502(d)?

B. Whether the Commonwealth failed to establish beyond a reasonable doubt that Edward [Major] did the act that killed Heather Nunn in furtherance of a robbery?

C. Should [Appellant] be entitled to a requested jury instruction when the Trial Court abused its discretion by refusing to make a legal determination re Penny Dotson's accomplice charge and simply state to the effect that Penny Dotson is a corrupt and polluted source?

D. Whether the Trial Court abused its discretion in allowing the jury to hear coconspirator statements when the trial court agreed that its admission put too much weight into the conspiracy and it did not fit within the coconspirator exception to the hearsay rule?

E. Whether [Appellant] was denied his Sixth Amendment right to confront witness's [sic] when the trial court admitted Hayward Stewart's prison phone conversations involving Anthony Spencer and Jinelly Garcia which the trial court had agreed that its' [sic] admission did not fit the coconspirator exception to the hearsay rule?

F. Whether the trial court manifestly abused its discretion in denying [Appellant's] motion for severance?

G. Whether the Trial Court clearly abused its discretion in granting the Commonwealth's motion in limine in refusing to allow [Appellant] to present evidence that it was Kevin Major who committed the crime charged and by precluding [Appellant] from pursuing the vital areas on cross-examination?

H. Whether the trial court abused its discretion as a matter of law in acting contrary to Jordan's Sixth amendment right to effective assistance of counsel by refusing to find [a] conflict of interest which Mr. Gratton's representation diverged with a highly crucial state and federal witness Penny Dotson she [sic] who testified against [Appellant]?

Appellant's Brief at 9–10.

Initially, we note that Appellant's brief is not compliant with the briefing requirements set forth in the Pennsylvania Rules of Appellate Procedure. As provided in Pa.R.A.P. 2101, appellate briefs "shall conform in all material respects with the requirements of these rules," and failure to do so may result in the brief being quashed or dismissed. *Id*. We recognize that Appellant is acting *pro se*. While this Court is willing to liberally construe materials filed by a *pro se* litigant, Appellant is not entitled to any particular advantage because he lacks legal training. *Commonwealth v. Maris*, 629 A.2d 1014, 1017 n.1 (1993). Accordingly, a *pro se* litigant must

-6-

comply with the procedural rules set forth in the Pennsylvania Rules of Court. *Id*. For example,

> The argument [section] shall be divided into as many parts as there are questions to be argued; and shall have as the head of each part-in distinctive type or in type distinctively displayed-the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

Pa.R.A.P. 2119(a).

In the instant case, the defects in Appellant's brief are substantial. While Appellant details issues "A" through "H" in his statement of questions involved, the body of his brief presents only headings labeled "A" through "E." Appellant also describes two issues labeled "B." Moreover, the eight issues in the statement of the questions bear no relation to the five sections of the argument or the subheadings within the arguments, with the heading, lettering, and numbering system failing to coincide among the sections. *See* Pa.R.A.P. 2116, 2119. Appellant's fifty-page brief is rambling and often inexplicable. *See* Pa.R.A.P. 2119. Nonetheless, in the interest of justice, we address the arguments that can reasonably be discerned from this defective brief. *See Commonwealth v. Lyons*, 833 A.2d 245 (Pa. Super. 2003) (holding that while *pro se* brief was defective, this Court would address issues that could reasonably be discerned).

Appellant's first two issues challenge the sufficiency of the evidence supporting the verdict. In reviewing the sufficiency of the evidence, we

must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to prove every element of the offense beyond a reasonable doubt. *Commonwealth v. James*, 46 A.3d 776 (Pa. Super. 2012). It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. *Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007); *Commonwealth v. Moreno*, 14 A.3d 133 (Pa. Super. 2011). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. *Commonwealth v. Hansley*, 24 A.3d 410 (Pa. Super. 2011). Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Commonwealth v. Ratsamy*, 934 A.2d 1233 (Pa. 2007); *Commonwealth v. Brown*, 23 A.3d 544 (Pa. Super. 2011). Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so inconclusive that as a matter of law no probability of fact may be drawn from the circumstances. *Moreno*, 14 A.3d at 133.

Murder of the second degree is a criminal homicide committed "while a defendant was engaged as a principal or an accomplice in the perpetration of

a felony." 18 Pa.C.S.A. § 2502(b). Section 2502(d) defines perpetration of

a felony as:

> the act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

18 Pa.C.S.A § 2502(d). The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim.

* * *

[T]he responsibility of persons, other than the slayer, for a homicide committed in the perpetration of a felony requires proof of a conspiratorial design by the slayer and the others to commit the underlying felony and of an act by the slayer causing death which was in furtherance of the felony.

Moreover, it was stated by the Court in **Commonwealth v. Legg**, 417 A.2d [1152,] at 1154 [(Pa. 1980)]:

> When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact the actor was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known that death might result from the felony. (footnote omitted)

* * *

The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or

an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. Rather, the fact finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1022–1023 (Pa. Super. 2002) (*en banc*) (some internal citations and quotation marks omitted).

Curiously, rather than focusing upon the evidence presented at trial concerning his involvement in the crime, Appellant argues that the Commonwealth failed to produce sufficient evidence regarding co-defendant Edward Major. Appellant's Brief at 29. Further, he assails the evidence proffered by Commonwealth eyewitness, Brian Sanchez, who allegedly excluded Appellant's involvement in the underlying robbery. ***Id***. at 31. Appellant suggests the robbery was not jointly planned, Appellant "acted independently," and there was no evidence that Appellant entered the vehicle used by the Co-defendants to go to Ms. Nunn's residence. ***Id***. at 33–35.

The trial court offered the following pertinent analysis concerning Appellant's challenge to the sufficiency of the evidence:

Sometime in the afternoon on October 24, 2004, Penny Dotson ("Dotson") overheard [Appellant], Hayward Stewart, Michael Stewart, and Edward Major (collectively, "Defendants"),

discussing plans to commit a robbery. Dotson then left 19 Seymour Street ("Home") for several hours, but eventually returned to the Home. Shortly thereafter, Dotson heard the Defendants enter the Home and begin talking in the kitchen. Dotson overheard Michael Stewart state that "she was shot." Dotson then entered the kitchen and saw a semi-automatic pistol laying on the kitchen table. Later that night, Dotson was watching television and learned that a murder had taken place on Pearl Street. Dotson suspected that Heather Nunn ("Heather") was the victim because Heather lived on Pearl Street, and Dotson knew that the Defendants went to Heather's home to commit the robbery.

Kevin Major testified that he and the Defendants were smoking marijuana at the Home when [Appellant] said that he wanted to rob "[Heather] from Pearl Street" because she sells marijuana and therefore had money. [Appellant] then said "let's go." Before the Defendants left the Home, Edward Major went upstairs, retrieved a .32 caliber handgun ("Handgun") and came back downstairs. Kevin Major then testified that the Defendants exited the Home, he heard car doors close, and heard the car start. Approximately 45 minutes later, the Defendants returned to the Home. Kevin Major was still in the Home and [Appellant] stated to him "your cousin's fucking crazy. He killed that girl." Shortly thereafter, acting on Kevin Major's advice, Edward Major put the Handgun in a plastic bag and buried it in the backyard of the Home.

Donnette Hunter ("Hunter") testified that [Appellant] demanded she act as his alibi, and threatened violence if she did not comply. In her original statement to police, Hunter claimed that [Appellant] arrived at her home around 10:04 on October 24, 2004, however [Appellant] did not actually arrive until after midnight on October 25, 2004. [Appellant] then returned to Hunter's home repeatedly over the next several days to inquire about what she had told police, showed her a handgun that was tucked in his waistband, and threatened to hurt her if she did not lie.

Finally, Michael Thomas, a Community Service Aid for the City of Lancaster, allowed [Appellant] to make a phone call after his arraignment on February 26, 2010. [Appellant] stated "they

got me in for that murder, the murder of my friend" and "the one with that girl" during the course of a phone conversation with his mother. Upon review, we find that the evidence, when viewed in a light most favorable to the Commonwealth as the verdict winner, was sufficient to sustain [Appellant's] conviction on the charge of second degree murder. Specifically, the circumstantial evidence tends to show that [Appellant] was engaged as a principal or accomplice in the perpetration of the robbery which ultimately resulted in the shooting death of Heather.

Trial Court Opinion, 4/1/14, at unnumbered 2–4.

Viewing the evidence in the light most favorable to the Commonwealth, as we must, it is beyond peradventure that Appellant was present when the plan was formulated to rob Heather Nunn. N.T., 3/8/11, at 672–673. He participated in the conception of the plan, commenting that he wanted "to rob somebody," and identifying Heather "from Pearl Street" as that person. N.T., 3/9/11, at 860–861. Co-defendants left the house together with a gun, and when they returned together, Appellant told Kevin that his cousin, Eddie, was crazy and that he "killed that girl." *Id*. at 876. After the men returned to Kevin and Penny's house, Appellant was the first to leave, and he admonished Co-defendants that if he saw them on the street, "I don't know you." N.T., 3/8/11, at 685–686. Appellant went to Donnette Hunter's house, spent the night, and the next day warned her that when she was questioned by the police, to tell them he came to her house earlier than he actually arrived. N.T., 3/10/11, at 1088–1097. Donnette indeed lied to police because Appellant threatened her that if she did not lie,

Appellant would "hurt" her. *Id*. at 1098–1099. Clearly, Appellant conspired to rob Heather Nunn, and during the course of that robbery, Heather was shot and killed. There was sufficient evidence for the jury to find Appellant guilty of second-degree murder.

Appellant next contends that the trial court gave an "improper accomplice instruction because of trial court's refusal to legally determine if, Penny Dotson's an accomplice, despite request, charge given, was abuse of discretion." Appellant's Brief at 36. This issue is waived. Prior to closing arguments, the trial court provided all parties with the proposed jury instructions and held a charge conference with counsel for Co-defendants, including Appellant. N.T. 3/15/11, at 1648–1671. During this conference all counsel, including Appellant, had an opportunity to object to the jury charge. Indeed, the trial court was especially solicitous of *pro se* Appellant's position on the points for charge. For example, when discussing individual points of the instructions, the trial court asked counsel, "Anybody have any problem with this?" *Id*. at 1650. Following the responses, the trial court at times specifically addressed Appellant, inquiring, "Mr. Jordan, are you okay with that?" *Id*. Not once during this detailed jury instruction review did Appellant make any objection.[3] Indeed, when discussing accomplice

---

[3] Appellant contends that "a joint defense 'continuing objection' and a simple request was made by all attorneys, i[n]cluding Jordan," and he references the notes of testimony on March 14, 2011, at pages 1578 and

instructions, President Judge Madenspacher stated, "I spent—I must have spent more time on this charge than on any other case, civil or criminal, than I ever did because there were so many things." *Id*. at 1653.

Further, after the trial court instructed the jury, which was consistent with how the parties were instructed during the charge conference, Appellant failed to object. N.T., 3/17/11, at 1823–1853. Appellant's failure to object contemporaneously with the charge waived this issue for appeal. Pa.R.Crim.P. 647(B) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate."). Because Appellant failed to timely object, this issue is waived and warrants no further review. *Commonwealth v. Hunzer*, 868 A.2d 498 (Pa. Super. 2005) (failure to object to jury instructions waives issue on appeal).

Even if this issue had not been waived, we conclude that it lacks merit. "For an accomplice charge to be required, the facts need to permit an inference that the witness was an accomplice." *Commonwealth v. Smith*, 17 A.3d 873, 906 (Pa. 2011). Despite the fact that the testimony at trial did not support the conclusion that Penny Dotson took part in the crime charged, N.T., 3/8/11, at 650–791, the trial court charged the jury, in its

---

1579. Appellant's Brief at 36. There is no such objection at that location. Appellant renews this same reference in his reply brief. Appellant's Reply Brief at 11.

instructions regarding accomplice testimony, that "whether Penny Dotson was an accomplice" is to be decided "if you were persuaded that it is more probably likely that she was an accomplice than she was not." N.T., 3/17/11, at 1833–1834. The trial court also instructed jurors that they must consider Penny's previous convictions, drug use, and prior act of perjury when evaluating her testimony. *Id*. at 1834–1836. We have stated:

> In reviewing a jury charge, we are to determine "whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case." *Commonwealth v. Brown*, 911 A.2d 576, 582–83 (Pa. Super. 2006). In so doing, we must view the charge as a whole, recognizing that the trial court is free to use its own form of expression in creating the charge. *Commonwealth v. Hamilton*, 766 A.2d 874, 878 (Pa. Super. 2001). "Our key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Id*. It is well-settled that "the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Brown*, 911 A.2d at 583.

*Commonwealth v. Scott*, 73 A.3d 599, 602 (Pa. Super. 2013). We discern no error in the charge to the jury.

Appellant's next three issues relate to alleged trial court error in refusing to sever Appellant's case and allowing the introduction of redacted portions of co-defendant Hayward Stewart's prison telephone calls. The trial court explained in its opinion that "[t]his occurred on the eighth day of trial and revolved around three phone calls made by Hayward Stewart." Trial

Court Opinion, 4/1/14, at unnumbered 4. Hayward did not testify at trial, and Appellant acknowledges this fact. Appellant's Brief at 39. The first call was excluded in its entirety. N.T., 3/14/11, at 1517, 1520. The other two calls were redacted because they referenced Co-defendants Michael Stewart and Edward Major. *Id*. at 1502–1526. Moreover, as the trial court explained, "[T]hese calls were used as evidence solely against Hayward Stewart." Trial Court Opinion, 4/1/14, at unnumbered 4.

At trial, out of the presence of the jury, there was extensive discussion about the audio tapes and transcripts of the prison telephone calls from Hayward Stewart to a friend. N.T., 3/14/11, at 1502–1527. The trial court concluded that it was impossible to edit the tapes themselves, and since they were admissible against Hayward, the trial court directed counsel to "work through suggested redactions." *Id*. at 1508. Appellant told the court with regard to the telephone calls, "[T]his defendant [Hayward Stewart] does not implicate [Appellant] involved at all with these conversations, I had a chance to read through this. It appears my name is not involved at all." *Id*. at 1509. Nevertheless, Appellant asserted the calls were "still incriminating." The trial court replied, "I'm pretty sure we can redact this safely. That's why you are going to be here. You'll be allowed to participate in this." *Id*. at 1510. Appellant responded, "I don't want to participate in

none [sic] of this stuff. It doesn't implicate me. . . . For the record, motion to sever." *Id*.

The trial court denied the motion. As the redaction discussion continued, Appellant asserted once again, "As the Court is aware, the phone recordings do not implicate myself at all whatsoever." N.T., 3/14/11, at 1514. Nevertheless, once again, Appellant asserted, "[I]t's incriminating to [Appellant]," yet he proceeded to agree with the Commonwealth on its suggested redaction of the third call. *Id*. at 1516, 1518–1519.

Appellant references *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny, where the United States Supreme Court admonished that the inculpatory statement of a non-testifying co-conspirator can only be used against the declarant. Therefore, Appellant inartfully suggests that the introduction of the redacted telephone calls implicated him and violated his Confrontation Clause right to question a witness against him. We disagree.

In *Bruton*, the United States Supreme Court held that a defendant is deprived of his Confrontation Clause rights when the statement of a non-testifying co-defendant names the defendant as a participant in the crime, even if the jury is instructed to consider that confession only against the codefendant. That was not the situation here. There is absolutely no reference, overt or by implication, that Hayward was referring to Appellant. As the Court stated in *Richardson v. Marsh*, 481 U.S. 200, 211 (1987),

"[T]he Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Indeed, our Supreme Court has stated:

> As a general matter, when read together, **Bruton**, **Richardson**, and **Gray** [**v. Maryland**, 523 U.S. 185 (1998)] stand for the notion that a statement of a non-testifying co-defendant, provided that the trial court gives a limiting instruction to the jury admonishing them to consider the statement against solely the declarant, will violate the Confrontation Clause only when the jury can tell from the face of the statement to whom it is referring; if the jury must refer to other evidence to determine to whom the statement refers, the Confrontation Clause rights of the defendant are not violated.

**Commonwealth v. Miller**, 819 A.2d 504, 512 (Pa. 2002).

As the trial court noted in its opinion, it gave "a curative instruction that [the telephone] statements could only be used against Hayward Stewart and not against any of the other Defendants." Trial Court Opinion, 4/1/14, at unnumbered 5 (citing N.T., 3/14/11, at 1540; N.T., 3/17/11, at 1838). The trial court did not err.

Next, Appellant contends that Kevin Major's admissions, through the course of interviews, that he fired handguns at people when he was twelve years old and in 1997 and 1998 should have been admitted into evidence and were not precluded by Pa.R.E. 404. The **Commonwealth** made an oral motion *in limine* to exclude the evidence because the incidents were too

remote in time to be of value in the instant 2004 homicide. The trial court agreed and granted the motion. N.T., 3/9/11, at 912–917.

It is well settled that the decision to admit or exclude evidence is vested in the sound discretion of the trial court. *Commonwealth v. Feliciano*, 67 A.3d 19 (Pa. Super. 2013) (*en banc*). Indeed, the admission of prior bad acts is within the discretion of the trial court and will only be reversed upon a showing of abuse of discretion. *Commonwealth v. Chmiel*, 889 A.2d 501 (Pa. 2005). "Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Aikens*, 990 A.2d 1181, 1184-1185 (Pa. Super. 2010) (internal citations omitted). Moreover, evidence of other crimes committed by a defendant generally is not admissible to show his criminal propensity; it is admissible, *inter alia*, to establish the existence of a common scheme or plan. *Commonwealth v. Keaton*, 45 A.3d 1050, 1066 (Pa. 2012) (citing *Commonwealth v. Bronshtein*, 691 A.2d 907, 915 (Pa. 1997); Pa.R.E. 404(b)(2)). "Whether evidence of a prior bad act is admissible under Rule 404 is a straightforward relevance test that can be assessed by analyzing the charges, the proffered testimony, and evidence available to support the offer of proof." *Commonwealth v. Hicks*, 91 A.3d 47, 53 n.8 (Pa. 2014).

The trial court addressed this issue as follows:

> Although in virtually every case, it is the Commonwealth seeking to **admit** prior bad acts, the rule is equally applicable to Defendants. [Appellant] argues it is relevant to show that Kevin Major was an individual of violent propensities and that it was, in fact, he who committed the attempted robbery and murder. However, this is exactly what Rule 402(b)(1) excludes. [Appellant] also claims it was admissible to impeach the witness; however, [he] does not say how it would do so. This witness was easily impeachable, and **was** impeached, as the transcript of his testimony shows. Assuming that these prior bad acts would have been relevant, the question of whether relevant evidence is unduly prejudicial is a function in part of the degree to which it is necessary to prove the case of the opposing party. ***Commonwealth v. O'Brien***, 836 A.2d 966 (Pa. Super. 2003). Here the defense had a wealth of information [with] which to impeach the witness, making this type of evidence unnecessary for mere impeachment.

Trial Court Opinion, 4/1/14, at unnumbered 6 (emphasis added). We discern no abuse of discretion.

Finally, Appellant proposes that Attorney Gratton had a conflict of interest because he had once represented Penny Dotson at her preliminary hearing for insurance fraud in an unrelated matter, and the trial court erred in failing to grant Appellant's motion for new court-appointed counsel.

We referenced this matter in Appellant's appeal at 764 MDA 2011 where he stood trial on unrelated murder charges on November 16, 2010, at Lancaster County Court of Common Pleas Docket No. 261 of 2010, before the Honorable Howard F. Knisely and a jury, because Appellant raised the issue therein. We explained:

Judge Madenspacher held a conflict hearing on October 12, 2010 . . . . Mr. Gratton testified that he began his representation of Appellant by his assignment to the case before Judge Madenspacher in February 2010. N.T. (Conflict Hearing), 10/12/10, at 3. In April 2010, Attorney Gratton "handled a preliminary hearing of Penny Dotson before Judge Ballentine for a Misdemeanor 1 insurance fraud case." *Id*. Assistant public defender Gratton stated:

> My recollection from speaking, as best I can recall from the preliminary hearing and the negotiations that day is that [the assistant district attorney] and I did not have any discussions about Mrs. Dotson being a witness in any murder case of any sort. And I first learned that she had some connection to Mr. Jordan's case—in fact, I first learned that she was a significant witness, as far as I can tell, after I received discovery in the homicide case before Your Honor.

*Id*. at 4.

Attorney Gratton testified before Judge Madenspacher that Penny Dotson allegedly overheard a plot to rob Heather Nunn, the victim . . ., who ultimately was shot to death. N.T. (Conflict Hearing), 10/12/10, at 2. Mr. Gratton stated that he "didn't remember a whole lot" about his representation of Ms. Dotson "until I pulled the file to see what I had done for her and what it was." *Id*. at 4.

In discussion with Appellant about the Heather Nunn murder, Mr. Gratton stated that he told Appellant that he (Gratton) knew the character of some of the Commonwealth's witnesses, specifically Penny Dotson, due to Mr. Gratton's prior representation of her. N.T. (Conflict Hearing), 10/12/10, at 5. Mr. Gratton allegedly told Appellant that he (Attorney Gratton) would challenge Ms. Dotson's credibility by asking her about the *crimen falsi* conviction, within the confines of their attorney-client privilege. *Id*. at 5–6.

The assistant district attorney also testified at the October 12, 2010 hearing. He stated:

> I actually don't have any specific recollection of this case. I handle hundreds of preliminary hearings a year. I don't remember the case. I did take a look at the criminal complaint to see if it could refresh my recollection. It didn't. I can tell the Court that this—I didn't know she was a cooperating witness, because had I known that, it would have definitely stuck out in my memory and I would not have pled her to a *crimen falsi* offense if I had known she was an important Commonwealth witness.

N.T. (Conflict Hearing), 10/12/10, at 6.

Judge Madenspacher concluded that Mr. Gratton had no conflict in representing Appellant. N.T. (Conflict Hearing), 10/12/10, at 7. Judge Madenspacher opined that the situation presented more of a concern for the Commonwealth, which "could file a petition for you requesting you to withdraw from the case since you had actually represented a prior Commonwealth witness and therefore, in theory, know things about that witness that, to be quite frank, could help you in this particular case." *Id*. at 7–8.

*Commonwealth v. Jordan*, 764 MDA 2011, ____ A.3d ____ (Pa. Super. filed February 14, 2014) (unpublished memorandum at 12–15), reargument denied, June 24, 2014.

Appellant asserts that stand-by counsel Gratton breached his duty of loyalty. At the Conflict hearing, the trial court asked Mr. Gratton if he perceived a conflict. Counsel responded:

> Your Honor, we reviewed it and spoken [sic] with Sam Stretton, who's our usual ethics referral expert. He's an attorney out of Chester County. He didn't see it. I am certainly not going to have any problems cross-examining Penny Dotson and asking her about her *crimen falsi* conviction which she has. In all honesty, it's probably better to have the false reports then

insurance fraud. It's about as clear a *crimen falsi* offense as a witness could possibly have, and I'll have no problem asking her about it. . . .

. . . It certainly doesn't adversely affect my representing [Appellant].

N.T. (Conflict Hearing), 10/12/10, at 9–10.

It is clear from the testimony there was no conflict. There was no agreement to reduce Penny Dotson's charges for her testimony in Appellant's case. Further, the crime she pled to was a *crimen falsi* charge that came out at trial. Trial Court Opinion, 4/1/14, at unnumbered 6–7; N.T., 3/8/11, at 712. As Appellant cannot demonstrate any prejudice, this issue is meritless. Moreover, prior to trial, Appellant chose to represent himself, thereby further eliminating any argument of conflict.

As noted earlier, on January 28, 2011, the trial court began an on-the-record inquiry pursuant to ***Grazier*** where Appellant gave his reasons for wanting to proceed *pro se*. He again raised the conflict issue, but also asserted that he did not want Attorney Gratton to represent him because, in his prior homicide trial before Judge Knisel, Mr. Gratton allegedly sabotaged that case. Appellant stated he believed "wholeheartedly that Gratton has personal interests and personal bias against [Appellant]." N.T., 1/28/11, at 20–21. It appears that Appellant now is asserting that he had no choice but to proceed *pro se*. This claim is belied by the testimony at the hearing, reproduced below.

The trial court addressed this averment by Appellant as follows, and we rely on the court's explanation in rejecting the issue:

> [Appellant] was asked, "So, is it just Mr. Gratton's representation that is bothering you? I mean, if I go and let you represent yourself and you come back later and say, well, I really want another lawyer, not Mr. Gratton." Eventually, [Appellant] stated[,] I still elect to proceed *pro se*. **No matter if there is a change or not, I want to proceed *pro se* in this case.**
>
> The Court then began its colloquy of [Appellant] and the first thing was that he had the right to be represented by counsel, and the right to free counsel if he was indigent. Specifically the colloquy went as follows:
>
> > THE COURT: Now, you do understand that you have the right to be represented by counsel? You understand that?
> >
> > [APPELLANT]: Yes.
> >
> > THE COURT: And obviously, you understand that you have the right to free counsel appointed for you if you are indigent.
> >
> > Do you understand that?
> >
> > [APPELLANT]: Correct.
> >
> > THE COURT: And not only do you not want your current appointed counsel, Mr. Gratton, you don't want anybody else appointed either, is that correct?
> >
> > [APPELLANT]: Repeat that again.
> >
> > THE COURT: In addition to not wanting Mr. Gratton as your attorney, you don't want me to appoint anybody else for an attorney for you either.

[APPELLANT]:  In regards to standby counsel, I do want you to—I do request to—

THE COURT:  I'm not talking about standby counsel, I'm talking about trial counsel, okay?  Right now, until I rule otherwise, Mr. Gatton is your trial counsel.  You don't want him as your trial counsel.  You want to represent yourself.  I want to make sure that you want to represent yourself and not come back and say, Judge, what I really meant was I didn't want Mr. Gratton, I wanted somebody else other than Mr. Gratton.

[APPELLANT].  No.  This is—again, numerous times, this is the wholeheartedly decision that's been throughout.  I am proceeding *pro se* as my right.

THE COURT:  I just want to make that clear.  Do you understand that?

[APPELLANT]:  It's crystal, Very clear. Distinctly.

THE COURT:  So you know you have the right to a free attorney if you want one?

[APPELLANT]:  Correct.

Thereafter he was informed of the nature of the charges and the maximum penalties.

* * *

[Appellant] has no basis to say he had no other choice.  He claims Mr. Gratton had a conflict when he did not, and despite the opportunity given to him to request a different attorney[, h]e insisted on his right to represent himself.

[Appellant] was bound and determined to represent himself in this case.  At [the remand ***Grazier***] hearing[,] [Appellant] insisted on representing himself on appeal[,] rejecting the appointment of appellate counsel . . . after [previously] asking the Court to appoint appellate counsel.

Trial Court Opinion, 4/1/14, at unnumbered 8–10 (some citations to the record omitted) (emphasis added).

We conclude that there is no merit to any of the issues Appellant has raised in this appeal. Therefore, we affirm the judgment of sentence.

Judgment of sentence affirmed.

MUNDY, J., Concurs in the Result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/3/2014